## LASSETER *v.* O'NEILL.

1. An agreement for the purchase and sale of cotton "on margin, commonly called dealing in futures, when the intention or understanding of the parties is to receive or pay the difference between the agreed price and the market price at the time of the settlement," though it is an agreement which is condemned by the Civil Code (1910), § 4258, as unlawful, is not a gaming contract in the sense and meaning of the Civil Code, § 4256, to the effect that money paid upon such consideration may be recovered back from the winner by the loser, under certain conditions stated.

2. Under the answer given above to the first question propounded by the Court of Appeals, the answer to the second question must necessarily be in the negative; and no answer is required to the third question,

Gaming, 27 C. J. p. 1089, n. 92; p. 1097, n. 27.
Statutes, 36 Cyc. p. 1135, n. 6.

as an answer to that was requested only in case the first question should be answered in the affirmative.

No. 5157. September 28, 1926.

The Court of Appeals (in Case No. 16587) propounded the following questions for instruction of the Supreme Court, as necessary to a decision in the case:

1. Is an agreement for the purchase and sale of cotton "on margin, commonly called dealing in futures, when the intention or understanding of the parties is to receive or pay the difference between the agreed price and the market price at the time of settlement," and being an agreement which is condemned by the Civil Code (1910), § 4258, a gaming contract within the sense and meaning òf the provision of the Civil Code (1910), § 4256, to the effect that money paid "upon such consideration may be recovered back from the winner by the loser," under certain conditions? In other words, where one of the parties to such agreement (in which there is no question of agency but in which the parties deal with each other as buyer and seller) deposits money with the other solely as such "margins" and loses it, is he entitled to recover it, "if he shall sue for the same in six months after the loss"? *Thompson* v. *Cummings*, 68 *Ga.* 124 (2); *Cunningham* v. *National Bank of Augusta*, 71 *Ga.* 400 (51 Am. R. 266); *Lawton* v. *Blitch*, 83 *Ga.* 663 (10 S. E. 353); *Clarke* v. *Brown*, 77 *Ga.* 606 (4 Am. St. R. 98); *Dyer* v. *Benson*, 69 *Ga.* 609; *Anderson* v. *State*, 2 *Ga. App.* 1 (58 S. E. 401); *Miller* v. *Shropshire*, 124 *Ga.* 829 (53 S. E. 335, 4 Ann. Cas. 574); Civil Code (1910), § 4264.

2. Could an action for the recovery of the money so deposited be held good as against a general demurrer, where the agreement is set forth in the petition and alleged to be illegal, and where it is further alleged that because of the illegal character of the agreement as a gaming contract the plaintiff is entitled, under section 4256 of the Civil Code (1910), to recover the deposits so made? *Alford* v. *Burke*, 21 *Ga.* 46 (4) (68 Am. D. 449); *Leverett* v. *Stegall*, 23 *Ga.* 257, 259; *Ingram* v. *Mitchell*, 30 *Ga.* 547 (3); *Smith* v. *Ray*, 89 *Ga.* 838 (16 S. E. 90); Cobb's Digest, 727, 728.

3. If both of the above questions should be answered in the affirmative, would it ordinarily be necessary for the plaintiff to

allege a previous demand for payment, or some legal reason for not having made such demand? *Dancy* v. *Phelan,* 82 *Ga.* 243 (2) (10 S. E. 205).

*James Maddox,* for plaintiff. *Denny & Wright,* for defendant.

BECK, P. J. 1. The Civil Code (1910), § 4256 provides: "Gaming contracts are void, and all evidences of debt or incumbrances or liens on property, executed upon a gaming consideration, are void in the hands of any person. Money paid or property delivered up, upon such consideration, may be recovered back from the winner by the loser, if he shall sue for the same in six months after the loss, and after the expiration of that time it may be sued for by any person, at any time within four years, for the joint use of himself and the educational fund of the county." In § 4117 of the same code it is provided: "A bare contingency or possibility can not be the subject of sale, unless there exists a present right in the person selling, to a future benefit; so a contract for the sale of goods to be delivered at a future day, where both parties are aware that the seller expects to purchase himself to fulfill his contract, and no skill and labor or expense enters into the consideration, but the same is a pure speculation upon chances, is contrary to the policy of the law, and can be enforced by neither party." In § 4253 it is provided: "A contract which is against the policy of the law can not be enforced; such are contracts tending to corrupt legislation or the judiciary, contracts in general in restraint of trade, contracts to evade or oppose the revenue laws of another country, wagering contracts, contracts of maintenance or champerty." The above several sections of the Code of 1910, counted in the order above set out, appeared in identical language in the first Code (Code of 1861) as §§ 2717, 2594, and 2714. And they have been embodied in the several succeeding Codes. Each of them outlaws contracts of the character specified in each. Contracts that are illegal will not generally be enforced. The law will leave the parties where it finds them. In *Ingram* v. *Mitchell,* 30 *Ga.* 547 (5), applying this principle it was said: "When money is actually paid over upon an illegal contract, it is clear that it can not be recovered back, the contract being executed, and both parties being in *pari delicto.*" See also *Dorsett* v. *Garrard,* 85 *Ga.* 734 (11 S. E. 768).

It would require a statute, in the circumstances mentioned in

the foregoing excerpt, to authorize the person who had paid out
the money to bring an action to recover it back.   The above quoted
§§ 4117 and 4253 of the Code of 1910, though having the effect
of statutes, do not contain any provision authorizing a suit to
recover money paid out on the contracts specified therein.   Sec-
tion 4256 alone contains such a provision.   The first part of that
section outlaws the contracts, while the latter part authorizes
suit to recover back money paid out under the contract.   In virtue
of the adoption of the Code of 1910 by the legislature, that section
has all the binding effect of a statute.   A marginal note to that
section cites the acts of 1764 and 1765 (Cobb, 725-727) as the
source from which it was codified.   That note is entitled to con-
sideration as a part of the statutory law, as indicating the legis-
lative intent in adopting that provision of law.   The first section
of the act of 1764 related entirely to lotteries and transactions
in the nature of lotteries, and was intended to suppress them.
The second section was for the purpose of suppressing other forms
of gaming.   Neither of them authorized the bringing of suits to
recover money or property that had been paid out on account
of losses incurred by practices condemned in the statute; but in
the succeeding year the act of 1765 provided that persons who
might lose money or goods by "playing" or "betting" at "any
game whatever" might, after having "paid or delivered" the
money or goods so lost, maintain a suit for its recovery against
the "winner," if instituted within six months "next following;"
and in case the loser failed to institute such suit within six
months, any other person might bring the suit within four years,
"one moiety of the money or effects" to be recovered to be for
the use of the person suing for them, and "the other moiety"
to be for "the use of the poor of the parish where the offense shall
be committed."   This act made special reference to the act of
1764, but did not authorize suits to recover money or property
paid out on account of losses by lotteries or transactions in the
nature of lotteries.   It only authorized suits for such recoveries
for money paid out or property delivered on account of losses
sustained by "playing" or "betting" "at any game whatever."
So, in the adoption of section 4256, the word "gaming" was
used in the sense of "playing" or "betting" at a game; and the
provision thereof, "money paid or property delivered up, upon

such consideration, may be recovered back from the *winner* by the *loser* [italics ours], if he shall sue for the same in six months after the loss, and after the expiration of that time it may be sued for by any person, at any time within four years, for the joint use of himself and the educational fund of the county," had reference to recovery of money or property paid or delivered up on account of losses by playing or betting at a game. All gaming and gaming or wagering contracts are denounced, but the foregoing is the only instance in which there is legislative enactment authorizing a loser to recover from the winner money or property after it has been paid by the loser to the winner.

The case of *Alford* v. *Burke,* 21 *Ga.* 46, was a suit against a stakeholder to recover money deposited by the plaintiff as a wager with another on a dog fight. The dog fight did not occur, and consequently there was no "winner," and the suit was not brought against the winner but against a stakeholder. It was held that the plaintiff could recover from the defendant stakeholder. This case was referred to in *Dyer* v. *Benson,* 69 *Ga.* 609, in which it was held: "Betting on a horse-race is gaming in the sense of the Code; and since its adoption, one who has lost a horse by betting on such a race may recover it by suing therefor within six months." That case was decided after adoption of the first Code, and construed the provisions of the Code as now embodied in § 4256, supra. After referring to the decision of *Alford* v. *Burke,* 21 *Ga.* 46, it was said in the opinion: "That was a dog fight; this is a horse-race. If betting on one be gaming, betting on the other is also gaming. It is true that that was a suit against the stakeholder for the plaintiff's half of the bet on the dog fight deposited with him, and that makes a case between one of the parties to the bet and the stakeholder, and not *between winner and loser.* [Italics ours.] The court there does not decide that the winner should respond to the loser if the money had been delivered; but the entire reasoning goes to the point that the bet on the dog fight is illegal. The court say that 'the great rule of public policy established by our legislature is, that the winner shall not be protected in his unlawful gains, and that the loser, though party to an illegal wager, may sue and recover back the money.' It is true that the same opinion, in the next and concluding paragraph, referring to the remedies then given in Cobb's Digest, pp.

726, 727, contains the words, 'that those statutes give remedies only in the cases mentioned in them' but the Code now—section 2759 [4256 of the Code of 1910]—extends the remedy to all gaming. Is horse-racing and betting thereon gaming? A game is any sport; originally racing was one of the games of antiquity. Thence, from foot-racing came chariot-racing, horse-racing, etc., etc., which all are sports or games for the diversion and amusement of spectators, and betting on any of these games becomes illegal, and gaming in the sense of the Code; and the loser of any money or other article lost on such bet may recover the article delivered, under the Code, from the winner of it. This must be the true sense of the section 2759 of the Code [4256], or it would have been limited, as the acts in Cobb's Digest, pp. 727, 728, were, to the games of cards, dice, etc., etc., therein enumerated. The codifiers wove into those old statutes the broader policy indicated by the opinion of Judge McDonald, in 21 *Ga.*, p. 46, and the legislation adopting the Code made it lawful for the loser to recover, within six months from the loss of his goods, from the winner the goods so lost, not only in the games specified in Cobb's Digest, but in all cases of gaming."

From the foregoing excerpt it appears that the case was brought within the provisions of the Code section by reason of the fact that horse-racing and betting thereon was gaming within the definition given, which may be quoted again: "A game is any sport; originally racing was one of the games of antiquity. Thence, from foot-racing came chariot-racing, horse-racing, etc., etc., which all are sports or games for the diversion and amusement of spectators, and betting on any of these games becomes illegal, and gaming in the sense of the Code." See also *Thrower* v. *State*, 117 *Ga.* 753 (4), 756 (45 S. E. 126); *Quillian* v. *Johnson*, 122 *Ga.* 49 (6), 58 (49 S. E. 801). In the case of *Thompson* v. *Cummings*, 68 *Ga.* 124, the suit was on a draft for $364.95. The defendants pleaded that the draft was drawn to pay the losses upon the purchase of cotton "futures" from the plaintiffs, both parties knowing that there was no cotton held by either, and that the same was nothing but a mere speculation upon chances. The defendants further pleaded, by way of set-off, that the plaintiffs were indebted to the defendants in the sum of $478.76 which defendants had "put up as a margin in the hands of the plaintiffs

to cover losses in the event of a decline in the price of cotton." It was held by this court: 1. "The sale of cotton to be delivered at a future day, where both parties are aware that the seller himself expects to purchase to fulfill his contract, and no skill and labor or expense enters into the consideration, but the same is a pure speculation upon chances, is contrary to the policy of the law, and can be enforced by neither party. But where such a contract is executed, an agent who may be employed by his principal to make the contract can recover from him any money advanced in the transaction by his authority. 2. No court will lend its aid to either party engaging in an illegal or immoral act. Therefore, he who deposits 'margins' in the purchase of cotton futures can not recover them by set-off or otherwise." This was a ruling, in a case involving cotton-future speculations, that a party to the transaction who was the loser of money thereby could not recover it back after it had been paid over, and it would make no difference that he was trying to recover it by a counter-claim by way of set-off in a suit instituted against him by the other party to the illegal transaction. This ruling would not have been made if the subject-matter of the set-off had consisted of money that had been won by "betting" at a "game," and the affirmative relief sought by the set-off had been pleaded by a "loser" against a "winner." The same may be said of the ruling in *Lawton* v. *Blitch,* 83 *Ga.* 663 (3), 665, where it was said: "Under our law, the losses sustained by the buying or selling of what is commonly called futures can not be recovered in a court of law."

After the statutes as embodied in the Civil Code (1910), §§ 4256, 4117, and 4253, had been established law for a long period of time, the legislature, on February 15, 1906, passed an act which is now embraced in the Civil Code (1910), § 4258, as follows: "Every contract or agreement, whether or not in writing, whereby any person or corporation shall agree to buy or sell and deliver, or sell with an agreement to deliver any wheat, cotton, corn, or other commodity, stock, bond, or other security, to any other person or corporation, when in fact it is not in good faith intended by the parties that an actual delivery of the articles or thing shall be made, is hereby declared to be unlawful, whether made or to be performed wholly within the State or partly within

and partly without this State; it being the intent of this section to prohibit any and all contracts or agreements for the purchase or sale and delivery of any commodity or other thing of value on margin, commonly called dealing in futures, when the intention or understanding of the parties is to receive or pay the difference between the agreed price and the market price at the time of settlement: Provided, that nothing herein contained shall be construed to apply to transactions by mail or wire between a person in this State and a person outside this State, where the person outside this State is not represented in this State by any broker, agent, or attorney in said transaction." Section 4259 provides: "Every person who shall become a party to any such contract or agreement as is by the two preceding sections made unlawful, and every person who shall as agent, directly or indirectly, participate in making or furthering or effectuating the same, and every agent or officer of any corporation who shall in any way knowingly aid in making or furthering any such contract or agreement, shall be guilty of a misdemeanor." This law does not apply to gaming as referred to in the Civil Code (1910), § 4256, and as defined in *Dyer* v. *Benson,* 69 *Ga.* 609. Nor does this act of 1906 authorize suits to recover money or property after it has been paid over in transactions such as are described in the act. The act shows that the legislature contemplated a penalty to be imposed upon persons engaged in such prohibited enterprises or transactions, because it provided for prosecutions of persons who might violate the statute, and for punishment therefor as for a misdemeanor; but it did not provide that any person losing money in such transactions could bring a suit to recover it back after it had been paid out under the illegal transaction. In accordance with the general rule where persons are in pari delicto in the violation of a positive law, the statute contemplated leaving the parties where it found them. In this view the first question propounded by the Court of Appeals is answered in the negative.

2. Having returned an answer in the negative to the first question, it follows that the second question should be answered in the negative. No answer is required to the third question, as it appears from the question itself that an answer to it is desired only in the event the first two should be answered in the affirmative.                *All the Justices concur, except*

53

HINES, J., dissenting.   Section 4256 of the Civil Code of 1910 is as follows: "Gaming contracts are void, and all evidences of debt or incumbrances or liens on property, executed upon a gaming consideration, are void in the hands of any person. Money paid or property delivered up, upon such consideration, may be recovered back from the winner by the loser, if he shall sue for the same in six months after the loss." Is an agreement for the purchase or sale of cotton "on margins," commonly called dealing in futures, when the intention or understanding of the parties is to receive or pay the difference between the agreed price and the market price at the time of settlement, a gaming contract within the meaning of the above section of the Code?   Such an agreement is made unlawful.   Civil Code (1910), § 4258.   Every person who shall become a party to any such contract or agreement, and every person who shall as agent, directly or indirectly, participate in making or furthering or effectuating the same, and every agent or officer of any corporation who shall in any way knowingly aid in making or furthering any such contract or agreement shall be guilty of a misdemeanor.   Civil Code (1910), § 4259.   The statute is very comprehensive.   It makes all gaming contracts void, and declares that money paid or property delivered up on a gaming consideration may be recovered back from the winner by the loser if suit is brought within six months for the loss.   In *Cunningham* v. *National Bank of Augusta, 71 Ga.* 400, this court said:   "Contracts for the purchase and sale of cotton futures are gaming contracts."   That case was again before this court in *National Bank of Augusta* v. *Cunningham, 75 Ga.* 366, when the ruling was reaffirmed.   Said ruling was again reaffirmed in *Walters* v. *Comer, 79 Ga.* 796 (5 S. E. 292), in which it was held that speculations in cotton futures are wagering contracts.   In *Alexander* v. *State, 86 Ga.* 246 (12 S. E. 408, 10 L. R. A. 859), this court held that "The business of buying and selling what are commonly known as futures, being gambling, is not protected by the interstate-commerce clause of the constitution of the United States."   This court further said: "This court and many other courts in this country have held that this business is gambling."   In *Moss* v. *Exchange Bank of Macon, 102 Ga.* 808. (30 S. E. 267), this court ruled: "A contract for the purchase and sale of 'cotton futures' is a gaming contract, and therefore

illegal and contrary to public policy." In *Forsyth Mfg. Co.* v. *Castlen,* 112 *Ga.* 199, 205 (37 S. E. 485, 81 Am. St. R. 28), this court said: "A contract for the future delivery of goods is not a wagering contract, when actual delivery of the goods is contemplated by either one or both of the parties. . . If, however, it is the intention of both parties to the contract that the goods shall not be actually delivered, but that there shall be a settlement of the differences between them, according to the market price of the article, on a given day, such a contract would be a wager and not enforceable by either party." See *Singleton* v. *Bank of Monticello,* 113 *Ga.* 527, 529 (38 S. E. 947). It will not do to say that section 4256 of the Code is applicable only to gambling with cards, dice, balls, and like means, and not to the colossal forms of gaming carried on in the form of dealing in futures, when delivery of the articles dealt in is not contemplated, but settlement on the difference between the contract and market prices.

In *Dyer* v. *Benson,* 69 *Ga.* 609, this court held: "Betting, on a horse-race is gaming in the sense of the Code; and since its adoption, one who has lost a horse by betting on such a race may recover it by suing therefor within six months." In the decision, Chief Justice Jackson said: "This must be the true sense of the section 2759 of the Code [now § 4256 of the present Code], or it would have been limited, as the acts in Cobb's Digest, pp. 727, 728, were, to the games of cards, dice, etc., etc., therein enumerated. The codifiers wove into those old statutes the broader policy indicated by the opinion of Judge McDonald, in 21 *Ga.* p. 46; and the legislation adopting the Code made it lawful for the loser to recover, within six months from the loss of his goods, from the winner the goods so lost, not only in the games specified in Cobb's Digest, but in all cases of gaming." Here is an express decision holding that the section of the Code under consideration was intended to cover "all cases of gaming." In *Thrower* v. *State,* 117 *Ga.* 753 (supra), this court affirmed the doctrine laid down in *Dyer* v. *Benson,* by again holding: "Betting on a horse-race is gaming within the meaning of the Code." In that case this court also held: "One who maintains a house for the purpose of such gaming is guilty of keeping a gaming-house, even though betting on a horse-race is not prohibited by statute, and though the race be run in a different State." In that case

this court further held: "The statute is not aimed at the games or the players, but against keeping a house where gaming of any sort is encouraged, and because of its tendency to corrupt morals and to ruin fortunes. . . There is a difference between gambling and gaming. In defining gaming contracts, the Code refers to contracts in which money has been wagered, although there may be no sport, no skill, no element of contest between those betting; and therefore, while some few courts rule that betting on a horse-race is not even gaming, most others (14 Am. & Eng. Enc. L. (2d ed.) 682, n. 1, 2) decide it to be gaming, and our own court has held that 'betting on a horse-race is gaming in the sense of the Code.' *Dyer* v. *Benson,* 69 *Ga.* 609. It may not be gambling, but it is gaming; and if so, a person who maintains a place where such betting is carried on as a business is keeping a gaming-house." The principle announced in the case last cited was followed in *Jones* v. *State,* 120 *Ga.* 185 (47 S. E. 561). In *McLennan* v. *Whiddon,* 120 *Ga.* 666 (48 S. E. 201), this court held: "Where one who has deposited money with a stakeholder as a wager notifies the stakeholder, while the money is still in his hands, that the bet is withdrawn, and instructs him not to pay it to the other party to the transaction, the stakeholder is bound to follow such instruction; and if, notwithstanding such notice, he pays the money to the winning party, the retracting party may, after demand upon him for the money so deposited, recover from the stakeholder, in an action for money had and received." In that case this court also made this ruling: "Gambling contracts are illegal in this State. All are under the ban of the law. None are more pernicious than those wagering money or other things of value on the result of elections. Such wagers 'strike at the foundations of popular institutions, corrupt the ballot-box, and interfere with the freedom and purity of elections.'" In *Quillian* v. *Johnson,* 122 *Ga.* 49, 58 (supra), this court held that money paid on a wagering policy of insurance could be recovered back, under the section of the Code which is now under consideration. The ruling of the court in that case is as follows: "By express statute, in this State, money paid or property delivered up in pursuance of a gaming contract may be recovered from the winner by the loser, if suit therefor be instituted within six months after the loss." In the decision Justice Evans said: "We recognize

the correctness of the proposition, that, as a general rule, neither a court of law nor a court of equity can lend its aid in enforcing an illegal contract or in distributing the fruits thereof. *Garrison* v. *Burns,* 98 *Ga.* 762 [26 S. E. 471]; *Exchange Bank* v. *Loh,* 104 *Ga.* 446 (3) [31 S. E. 459, 44 L. R. A. 372]. However, by express statute in this State (Civil Code, § 3671), 'money paid or property delivered up' in pursuance of a gaming contract, 'may be recovered back from the winner by the loser, if he shall sue for the same in six months after the loss.' Thus, money or property lost in betting on a horse race may be recovered, if suit therefor be instituted within the statutory period. *Dyer* v. *Benson,* 69 *Ga.* 609; *Doyle* v. *McIntyre,* 71 *Ga.* 673. And money posted as a wager on the result of an election may be recovered from the stakeholder, if, after notice that the bet has been withdrawn, he nevertheless pays it over to the winner without the assent of the retracting party. *McLennan* v. *Whiddon,* 120 *Ga.* 666. So, also, may money be recovered from an agent by a principal who placed the money in the agent's hands for the illegal purpose of playing the game of 'futures.' *Clarke* v. *Brown,* 77 *Ga.* 606."

Under the above decisions, contracts for the purchase and sale of articles, when the actual delivery thereof is not contemplated, but settlement is to be made upon the basis of the difference between the contract price and the market price, are gaming contracts, and money lost in such a transaction can be recovered by the loser from the winner if suit is brought within six months. There are certain cases which, at first blush, would seem to support the contrary doctrine. In *Thompson* v. *Cummings,* 68 *Ga.* 124, this court ruled that "he who deposits 'margins' in the purchase of cotton futures can not recover them by set-off or otherwise." That ruling was based on the principle that where parties engage in an illegal transaction the court will not interpose to grant any relief. In that case the suit was not brought under the statute embraced in Code section 4256; but was an effort of the defendant, under the common law, to set off against the plaintiff's claim margins deposited in the purchase of cotton futures. The set-off was not pleaded within six months after the margins were lost, but it was an effort to set them off under a proceeding under the common law and not under said statute. In *Clarke* v. *Brown,* 77 *Ga.* 606, the action was brought by a principal to recover from

his agents money deposited for the purchase of futures; and this court held that an action for money had and received would lie, the suit not being one upon a wagering contract nor to recover profits made in a gaming venture. In *Lawton* v. *Blitch,* 83 *Ga.* 663, the action was not brought under the statute which we have under consideration, but was an effort to recover losses sustained by buying and selling futures, independently of said statute. In *Miller* v. *Shropshire,* 124 *Ga.* 829, this court held that "inasmuch as the General Assembly permits one paying a license tax to engage in the business of buying and selling 'futures,' he can not be subjected to the penalty imposed by that section," the same being the section which we have under consideration. That decision was rendered on February 15, 1906. Since the passage of the act of August 20, 1906 (Acts 1906, p. 95), now embraced in sections 4258 et seq. of the Civil Code of 1910, the legislature has not passed any statute permitting one, upon paying a license tax, to engage in the business of buying and selling futures; and for this reason the principle announced in the case last cited is not applicable to the one at bar. So there is nothing in these cases, when properly construed, which conflicts with the conclusion that the purchase or sale of cotton on margin, commonly called dealing in futures, is a gaming contract within the meaning of section 4256 of the Code. In view of the ruling above made, the answer to the first and second questions propounded by the Court of Appeals should be in the affirmative.

There is nothing in *Alford* v. *Burke,* 21 *Ga.* 46, *Leverett* v. *Stegall,* 23 *Ga.* 257, *Ingram* v. *Mitchell,* 30 *Ga.* 547, and *Smith* v. *Ray,* 89 *Ga.* 838, in conflict with what is said above. In the first case just cited, it was ruled that "a party to an illegal, or immoral, or criminal contract may recover back from a stakeholder a deposit still in his hands." In *Leverett* v. *Stegall,* it was said that if one deposit as a stake the promissory note of a third person with another, and he deliver the same to the winner after being notified to withhold it, the depositor is entitled to recover the note from the winner in an action of trover. In *Ingram* v. *Mitchell,* this court held that "When money is actually paid over upon an illegal contract, it is clear that it can not be recovered back, the contract being executed, and both parties being in *pari delicto.*" In that case the suit was not brought under the statute

with which we are dealing, but was brought under the common law. In *Smith* v. *Ray,* this court held that "One who receives the money of another from a third person, by winning it at a game of chance played with such third person, is liable to the owner in an action for money had and received, and the right of action does not rest upon the statute, but upon the common law." In view of the decisions cited and dealt with above, I am clearly of the opinion that money lost by one dealing in futures, when the delivery of the article dealt in is not intended, but a settlement upon the difference between the contract price and the market price is contemplated, can be recovered by the loser from the winner if suit is brought therefor within six months from the date of the loss. The section of the Code with which we are dealing is broad and comprehensive; and this court on various occasions, as is shown above, has held that this section applies to all gambling and all gaming. I do not think that this court should now say, in view of the comprehensive language of this section and of the interpretation put upon it by this court in the cases cited above, that the transaction now under consideration does not come clearly within this provision of this section of the Code. In view of the great prevalence of gaming and gambling, this section of the Code should not be emasculated by limiting it to the forms of gambling enumerated in the opinion of the majority, but should be held applicable to all forms of gaming and gambling. So I am constrained to dissent from the opinion of the majority.